ALYSSA A. QUALLS (IL Bar No. 6292124)
*PRO HAC VICE* APPLICATION PENDING
Email: quallsa@sec.gov
BELINDA I. MATHIE (IL Bar No. 6275461)
*PRO HAC VICE* APPLICATION PENDING
Email: mathieb@sec.gov
175 West Jackson Blvd., Suite 1450
Securities and Exchange Commission
Chicago, Illinois 60604
Telephone: (312) 353-7390
Facsimile: (312) 353-7398

Attorneys for Plaintiff
United States Securities and Exchange Commission

LOCAL COUNSEL
Donald W. Searles (Cal. Bar No. 135705)
Email: searlesd@sec.gov
Securities and Exchange Commission
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>WINDSOR JONES LLC and ANTHONY COLLINS,<br><br>Defendants. | Case No.<br><br>**COMPLAINT**<br><br>**JURY DEMAND** |

Plaintiff Securities and Exchange Commission ("SEC") alleges:

## JURISDICTION AND VENUE

1. The SEC brings this action pursuant Section 20(b) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77t(b), and Section 21(d) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78u(d).

2. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, Sections 20(b), 20(d), and 22 of the Securities Act, 15 U.S.C. §§ 77t(b), 77t(d), and 77v, and Sections 21(d), 21(e), and 27 of the Exchange Act, 15 U.S.C. §§ 78u(d), 78u(e), and 78aa(a).

3. Defendants, directly and indirectly, made use of the means or instruments of transportation or communication in, and the means and instruments of, interstate commerce, or of the mails, or of the facility of a national securities exchange in connection with the alleged acts, practices, and courses of business alleged in this complaint.

4. Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a). Acts, practices, and courses of business constituting violations alleged herein have occurred within the jurisdiction of the United States District Court for the Central District of California and elsewhere. Moreover, two victims of Defendants' alleged securities violations reside in California, and one victim resides in this district.

## SUMMARY

5. Between November 2017 and September 2021, Defendant Windsor Jones LLC ("Windsor Jones"), through its United Kingdom-based principal Defendant Anthony Collins, conducted a fraudulent investment scheme involving fine wine.

6. Defendants raised at least $4 million through the fraudulent and unregistered offer and sale of investment contracts to at least 12 investors in the United States, most of whom are elderly.

7. Windsor Jones, through Collins, its sales representatives, and marketing materials, represented to investors that Windsor Jones would buy investment-grade wines for investors, later sell the wine at a profit, and would share in a portion of the profits with investors.

8. Specifically, Windsor Jones, through Collins, its sales representatives, and marketing materials, falsely represented to investors that: (a) their money would solely be used to purchase and store wine; (b) the wine could be expected to achieve a return ranging between 10% to 30%; and (c) the company would not receive any compensation or profit until the wine was sold.

9. These statements were false because Windsor Jones spent no more than 32% of the investors' funds on the purchase and storage of wine.

10. Further, Windsor Jones made only *de minimis* payments to investors, and misused investor funds by spending them on a variety of non-wine uses, including $367,000 for credit card payments, $176,000 for shopping at UK-based fine watch companies, and approximately $870,000 for payments to individuals, including sales representatives and workers who performed back-office functions for Windsor Jones, and $340,000 to Collins directly.

11. Windsor Jones and Collins also failed to disclose that they charged a mark-up of 30% to 50% to investors on their purchases of wine.

12. In addition, Windsor Jones and Collins failed to disclose that sales representatives received an up-front commission of 8% to 10% from investor funds.

13. Defendants' scheme has now collapsed, and the company has stopped responding to investors.

14. Defendants violated the federal securities laws, including Sections 5(a), 5(c), and 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder.

15. The SEC seeks a judgment permanently enjoining Defendants from future violations of these provisions of the federal securities laws; ordering them to disgorge their ill-gotten gains, on a joint a several basis, along with prejudgment interest; ordering them to pay civil penalties; and prohibiting Collins from serving as an officer or director of public companies.

## DEFENDANTS

16. **Windsor Jones LLC** is a Delaware limited liability company formed in August 2017 with its principal place of business at a virtual office in Wilmington, Delaware. In October 2022, the Iowa Insurance Commissioner issued a cease and desist order against Windsor Jones, Collins, and others finding, among other things, that they sold unregistered securities, acted as an unregistered securities agent, and made untrue statements of material fact in selling Windsor Jones's wine investments. *In the Matter of Windsor Jones, LLC*, Division Case No. 114218 (Iowa Ins. Comm. Oct. 31, 2022).

17. **Anthony Collins**, age 34, resides in Hammondswick, United Kingdom. Collins is the member and control person of Windsor Jones. In March 2020, the United Kingdom High Court of Justice ordered that a UK-based wine investment company controlled by Collins be wound-up "in the public interest" following complaints that the company was misleading and overcharging customers. In April 2021, Collins was disqualified from registering an entity with the United Kingdom Companies House for a 10-year period. As described above, in October 2022, the Iowa Insurance Commissioner issued a cease and desist order against Collins. *In the Matter of Windsor Jones, LLC*, Division Case No. 114218 (Iowa Ins. Comm. Oct. 31, 2022).

## FACTS

18. Section 5(a) and (c) of the Securities Act requires persons who offer and sell securities to the public to register those offers and sales with the SEC, absent certain exemptions or safe harbors that do not apply to Defendants' transactions.

19. The definition of a "security" under the Securities Act includes, among other instruments and investment vehicles, "investment contracts."

20. Investment contracts are instruments through which a person invests money in a common enterprise with an expectation of profits or returns produced by the entrepreneurial or managerial efforts of others.

21. Between November 2017 and September 2021, Windsor Jones raised at least $4 million from approximately 12 U.S. investors through the sale of purported fine wine investments that were investment contracts.

22. The Windsor Jones offering was not registered with the Commission.

23. The investors resided in various states throughout the United States, including two in California and one in this district. Most of them were elderly, and many were not accredited.

**I.    Windsor Jones and Collins Offered Purported Investments in Fine Wine.**

24. Windsor Jones, through its principal Collins, offered fraudulent purported fine wine investments.

25. Investors typically learned about the fine wine investment opportunity from unsolicited and repeated cold calls from sales representatives who said that they were acting on behalf of Windsor Jones.

26. The callers, who usually had British accents, represented that they would recommend specific vintages of investment-grade wines for investors to purchase.

27. Windsor Jones sales representatives and staff also used email addresses associated with the firm to follow up with investors.

28. The Windsor Jones sales representatives told investors that the selected wines would be stored in a secure, climate-controlled facility in France or the United Kingdom for the duration of the investment to preserve the wines' value and minimize taxes, and that the company had access to appropriate markets to sell the appreciated wines at a later date.

29. The sales representatives also told investors that the funds they invested would be used exclusively to purchase and store wine that would be the property of the individual investors.

30. The sales representatives told investors that the only compensation Windsor Jones would receive for its wine investment services was a commission –

typically 10% of wine sale profits but sometimes as low as 6% or 8% – upon sale of the investor's wine to a new purchaser.

31. The sales representatives also told investors that Windsor Jones would not be entitled to any compensation until the sale of the wine.

32. The investors, many of whom were not familiar with wine investments, were not expected to participate in the selection of their wines, their storage, or the resale process.

33. Instead, the investors relied on the expertise of Windsor Jones to generate a profit by recommending wines likely to increase in value, arranging to store them in a manner that would preserve their value, and identifying buyers for the appreciated wines.

34. The only decisions the investors made was whether to invest in the wine recommended by the sales representatives and whether to agree to the sale of their wine.

35. The sales representatives told investors that Windsor Jones had access to certain markets to sell the wine, including purported wealthy individual buyers in China.

36. The sales representatives also told investors that they could expect to make a profit because the wine would appreciate significantly in value (ranging from 10% to 30%) within a short time period (generally ranging from several months to a few years).

37. On some occasions, a Windsor Jones sales representative identified himself to investors as "Anthony" and/or "Anthony Collins."

38. The Windsor Jones sales representatives did not tell investors that they were required to hold the wine for any minimum period.

39. The sales representatives told investors they would realize the profit when the wine was sold.

40. However, on some occasions when investors contacted Windsor Jones to sell their wine, the sales representatives would advise the investors that their wine was not good enough to sell, but that if the investors bought more wine, the new larger package would be more attractive to buyers.

41. On at least two occasions, the Windsor Jones sales representative who tried to extract more money from investors who wanted to sell their wine identified himself as "Anthony" and/or "Anthony Collins."

### A. Windsor Jones and Collins Provided Investors with a Website and Marketing Materials.

42. Windsor Jones, through its principal Collins, provided marketing materials to investors ("Marketing Materials") and maintained a public website ("Website") describing the investment.

43. Collins controlled the Website and Marketing Materials.

44. The Marketing Materials and Website touted, among other things, the rising profitability of the fine wine investment market, how fine wine has outperformed other investment options, and the companies' expertise in achieving those profits for investors.

45. For example, on or about March 13, 2018, admin@windsorjonesllc.com emailed an investor a copy of the Marketing Materials, which stated that the investment goal was "to generate a return of over 10% per annum (net of fees)."

46. The emailed Marketing Materials also stated that Windsor Jones's compensation for their services would cover "the entire expense" of storing, handling, and insuring the investor's wine.

### B. Windsor Jones Entered Into Contracts with Investors and Collected Investor Funds.

47. The written contracts between Windsor Jones and its investors stated that the investor funds would be used to buy and store wine, including all taxes,

import duties, and purchasing and delivery fees, and did not include any provisions regarding compensation to Windsor Jones.

48. Windsor Jones sales representatives told investors that the only compensation Windsor Jones would receive was a percentage of the profits when the investors' wine was sold to a new buyer.

49. For example, on or about March 13, 2018, admin@windsorjonesllc.com emailed an investor a copy of the Marketing Materials, which touted that Windsor Jones had a team of experts with the tools and market knowledge to build a profitable wine portfolio that was "customised [sic] to suit [the investor's] individual investment goals."

50. The emailed Marketing Materials also assured investors that Windsor Jones "frequently and regularly revise[d] each of [its] strategies in accordance with market developments," and could "guarantee that [the investor's] portfolio is performing as effectively as possible."

51. Windsor Jones sales representatives told investors that Windsor Jones had the knowledge and expertise to select secure, climate-controlled warehouses for wine storage in France or the United Kingdom to preserve the wines' value and minimize taxes and arrange for wine shipping, handling, and insurance.

52. Windsor Jones sales representatives also told investors that Windsor Jones had knowledge of markets where the wine could be sold later at a profit, including the Chinese market, which was highlighted in the Marketing Materials.

53. Investors sent their funds via check or wire to one of two U.S.-based bank accounts held in the name of Windsor Jones.

54. Based on the foregoing, Windsor Jones investors invested in investment contracts.

55. Collins was the sole signatory for the two Windsor Jones bank accounts and was listed as the company's "member" in the account opening documents.

56. Following the receipt of investor funds, Windsor Jones typically sent investors an invoice listing the wine product and volume purportedly purchased on their behalf.

## II. Collins Made Statements Regarding the Windsor Jones Offering.

57. In or about May to August 2022, Collins made the following statements to a State of Iowa investigator, which were recorded:

(a) Collins controlled Windsor Jones, including its Website content and Marketing Materials, and Windsor Jones was created to sell wine-related investments to Americans;

(b) When Collins created Windsor Jones, he traveled to the United States to speak with accountants, open bank accounts, and look into the possibility of storing wine in the United States;

(c) Windsor Jones would acquire wine and arrange for it to be insured and stored on the investors' behalf;

(d) Collins told the sales representatives that investment-grade wine had sustained 8% to 10% annual growth over the past 25 years;

(e) Windsor Jones charged investors a mark-up of 30% to 50% on the wine, and paid the sales representatives commissions of 8% to 10% immediately after investors purchased wine; and

(f) The sales representatives would never have told investors how they were actually compensated or that Windsor Jones charged a mark-up on the initial sale of the wine to the investors.

## III. Windsor Jones and Collins Made Misrepresentations and Omissions of Material Fact to Investors and Misused Investor Funds.

58. Between November 2017 and September 2021, Windsor Jones and Collins received approximately $4,091,000 from at least 12 investors in their fraudulent investment scheme, but used no more than $1.3 million (32%) on the purchase and storage of wine.

59. Windsor Jones has returned a total of approximately $130,000 to five investors.

60. Windsor Jones representatives told one investor that it was returning $16,000 to him per his request to cancel a previous wine order in that amount.

61. Windsor Jones representatives told other investors that the remaining $114,000 in funds paid to investors were purported profits from wine sales, but the investors did not receive any sale documentation.

62. Windsor Jones' $140,000 payment to investors was well below the promised return, which Windsor Jones representatives said would range from 10% to 30% per investment.

63. Windsor Jones and Collins misused the remaining investor funds on a variety of non-wine uses, including $367,000 for credit card payments, $176,000 for shopping at UK-based fine watch companies, and approximately $870,000 for payments to individuals, including Windsor Jones sales representatives and workers who performed back-office functions.

64. Collins also caused Windsor Jones to misuse investor funds for his own benefit.

65. Specifically, Windsor Jones paid Collins approximately $340,000 in investor funds directly.

66. Other than the investor funds, Windsor Jones had minimal other income during this period.

67. The payments to sales representatives and back-office workers and Collins from investor funds were misuses because they were contrary to the representations made to investors that investor funds would be used only to purchase and store wine and that Windsor Jones would only receive compensation upon the sale of investors' wine.

68. Collins admitted to the Iowa investigator that Windsor Jones paid its sales representatives a commission of 8% to 10% when the investor submitted funds, and not when Windsor Jones sold the investor's wine.

69. And Windsor Jones, who paid Collins $340,000, was not entitled to receive any money until an investor's wine was sold to a new buyer, and was then only entitled to a percentage of the profits from that sale.

70. Windsor Jones and Collins also failed to disclose that they charged a mark-up of 30% to 50% to investors on their purchases of wine.

71. Collins admitted to the Iowa investigator that he knew that the Windsor Jones sales representatives were not disclosing to investors how they were being compensated or that Windsor Jones received compensation in the form of the mark-up on the initial sale of the wine to investors.

72. Accordingly, Windsor Jones and Collins knew, or were reckless in not knowing, that they were engaged in a scheme to defraud and/or a fraudulent course of business involving fine wine and that their statements and omissions to investors, via the Website, Marketing Materials, and Windsor Jones sales representatives, were false and/or misleading because (a) Windsor Jones and Collins were not using all of investor funds to purchase and store wine; (b) Windsor Jones was making significant payments to, among others, Collins, sales representatives, and back-office workers, from investor funds before the wine was sold; (c) Windsor Jones charged an undisclosed mark-up of 30% to 50% to investors on their purchases of wine; and (d) investors only received minimal payments and not the represented 10% to 30% returns.

**IV.     Windsor Jones Lulls Investors and Ceases Operations.**

73. Windsor Jones sales representatives repeatedly tried to lull investors into holding their investments or reinvesting in the fraudulent wine investment scheme.

74. For example, when investors contacted Windsor Jones to inquire about selling their wine, sales representatives would tell them that their portfolios were not

desirable enough, and they needed to purchase additional wine to make their "wine portfolio" attractive to a buyer.

75. In response to these solicitations, multiple investors sent additional funds.

76. Similarly, Windsor Jones sales representatives sometimes told investors by telephone that a specific buyer was interested in their wine portfolio, but only if they purchased certain additional wine.

77. However, there is no evidence that Windsor Jones ever sold investors' wine, at a profit or otherwise, or returned any wine profits to investors.

78. Windsor Jones appears to have ceased soliciting investors and the company has stopped responding to investor inquiries.

79. Windsor Jones closed one of its U.S. bank accounts in June 2002. It closed its other U.S. bank account in August 2022.

## FIRST CLAIM FOR RELIEF

**Violations of Section 5(a) and (c) of the Securities Act**

80. Paragraphs 1 through 79 are realleged and incorporated herein by reference.

81. By engaging in the conduct described above, without a registration statement in effect as to that security, Defendants, directly and indirectly: (a) made use of the means and instruments of transportation or communication in interstate commerce or of the mails to sell securities through the use or medium of any prospectus or otherwise; and (b) made use of the means and instruments of transportation or communication in interstate commerce or of the mails to offer to sell through the use or medium of a prospectus or otherwise, securities as to which no registration statement had been filed.

82. By reason of the foregoing, Defendants violated, and unless restrained and enjoined will continue to violate, Section 5(a) and (c) of the Securities Act, 15 U.S.C. § 77e(a) and (c).

## SECOND CLAIM FOR RELIEF

### Violations of Section 17(a) of the Securities Act

83. Paragraphs 1 through 79 are realleged and incorporated herein by reference.

84. By engaging in the conduct described above, Defendants, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails: (a) employed devices, schemes, and artifices to defraud; (b) obtained money or property by means of untrue statements of material facts or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices, and courses of business which operated or would operate as a fraud or deceit upon purchasers or prospective purchasers.

85. Defendants intentionally, recklessly, or negligently engaged in the fraudulent conduct described above.

86. By reason of the foregoing, Defendants violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

## THIRD CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5

87. Paragraphs 1 through 79 are realleged and incorporated herein by reference.

88. By engaging in the conduct described above, Defendants, directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce or of the mails: (a) used and employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c)

engaged in acts, practices, or courses of business which operated or would operate as a fraud and deceit upon purchasers and prospective purchases of securities.

89. Defendants intentionally or recklessly engaged in the fraudulent conduct described above.

90. By reason of the foregoing, Defendants violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court:

### I.

Issue findings of fact and conclusions of law that Defendants committed the alleged violations.

### II.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendants, and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Sections 5(a) and (c) and 17(a) of the Securities Act, 15 U.S.C. §§ 77e(a), 77e(c), and 77q(a), and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

### III.

Order Defendants to disgorge their ill-gotten gains, derived directly or indirectly from the violations alleged in this Complaint, on a joint and several basis, together with prejudgment interest thereon, under Section 21(d)(3), 21(d)(5), and 21(d)(7) of the Exchange Act, 15 U.S.C. § 78u(d)(3), 78u(d)(5), and 78u(d)(7).

#### IV.

Order Defendants to pay civil monetary penalties under Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

#### V.

Enter an Order, pursuant to Section 20(e) of the Securities Act, 15 U.S.C. § 77t(e), and Section 21(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2), permanently prohibiting Defendant Collins from serving as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act or that is required to file reports pursuant to Section 15(d) of the Exchange Act.

#### VI.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

#### VII.

Grant such other and further relief as this Court may determine to be just and necessary.

### JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff SEC demands a trial by jury on all claims so triable.

Dated: February 3, 2023

/s/ Donald W. Searles
DONALD W. SEARLES
Attorney for Plaintiff
Securities and Exchange Commission